**Kristoff GINTOWT,**

v.

**TL VENTURES, et al.**

**Civil Action No. 02–746.**

United States District Court, E.D. Pennsylvania.

Dec. 31, 2002.

Donald B. Lewis, Bala CYNWYD, PA, for Plaintiff.

Thomas E. Zemaitis, Pepper, Hamilton & Scheetz, Jeffrey K. Techentin, Matthew R. Skolnik, Pepper Hamilton LLP, Norman E. Greenspan, Blank Rome Comisky & McCauley LLP, Philadelphia, PA, Charles E. Talisman, Ronald S. Liebman, Andrew M. Friedman, Patton Boggs LLP, Washington, DC, for Defendant.

## *MEMORANDUM*

BAYLSON, District Judge.

### I. *Introduction*

On October 3, 2002, this Court issued a Memorandum and Order granting the Motion to Dismiss the original Complaint by a group of Defendants known as the "TL Ventures Defendants" and the individual Defendants Arthur Spector and James Dixon, with leave to Plaintiff to file an Amended Complaint. As directed by the Court, Plaintiff's Amended Complaint has been accompanied by a RICO case statement and a "blacklined" revision of the charging allegations of the Amended Complaint showing additional facts pleaded in the Amended Complaint that were not in the original Complaint. The RICO case statement contains additional factual allegations, which the Court will consider as part of the Amended Complaint.

After reviewing the Amended Complaint and the RICO case statement, the Court finds that the Plaintiff has remedied the defects in the original Complaint, and that the Motion of the moving Defendants to dismiss the Amended Complaint pursuant to Rule 12(b)(6) will be denied.

### II. *Allegations of the Amended Complaint*

In his Amended Complaint, Plaintiff adds to the original Complaint's allegations

the following facts, which, for the purpose of deciding the instant motion, will be considered in the light most favorable to Plaintiff. This summary assumes familiarity with the allegations of the original Complaint as discussed at length in this Court's October 3, 2002 opinion.

Defendant TL Ventures ("TL") "placed" on the Broadreach board Defendants Spector and Dixon, as well as two other individuals, Stephen Andriole and Gary Anderson. *See* Amended Complaint ¶ 5. Spector, who was formerly the Managing Director of TL, continued to act as an agent for the TL Defendants. *Id.* ¶ 7, 13. In August 1996, Spector represented to Plaintiff and the other Reohr partners that TL intended to invest in Reohr, merge it with a "similar," economically-viable company, and issue an initial public offering of stock in the new entity, Broadreach. *Id.* ¶ 13. Spector "led the Reohr partners to believe" that TL would use its own funds to pay the Reohr partners and that TL would provide capital funds to the new entity in the future. *Id.* Spector further represented that TL would employ highly qualified management personnel and avoid undue risks. Moreover, Spector led the partners to believe that Dixon was not interested in running the new entity and would only be an interim-CEO. Finally, he represented that the Reohr partners would have "equal control" of the new board. *Id.*

These representations, the Amended Complaint states, were false for several reasons. Firstly, the "similar" entity that TL planned to merge with Reohr was actually in weak financial condition. Second, TL intended to limit its own investment in the project by bringing in other investors and taking out bank loans through the new entity. Third, TL burdened Broadreach with debt from the start in order to finance its risky electronic-business strategy. Fourth, TL intended to, and eventually did, install Dixon as Broadreach's permanent CEO, in order to control the new company. Fifth, TL intended to control the Broadreach board. Finally, TL intended to "severely circumscribe" its capital investment in the new company. *Id.*

In furtherance of the TL Defendants' fraudulent scheme, on October 2, 1996 and November 18, 1996, Spector sent to the Reohr partners, via U.S. mail, "non-binding proposals" by which the TL Defendants proposed to acquire all of Reohr's assets and disclosed liabilities. *Id.* ¶ 14. The October 2, 1996 proposal indicated, specifically, that the purchase price for Reohr's assets would be $35 million (or stock in another entity, ITC, at the Reohr partner's option). *Id.*

Beginning on August 30, 1996, Spector and Dixon began to telephone the Reohr partners regarding the proposed purchase. Dixon made many telephone calls from Georgia and North Carolina. *Id.* In these interstate calls, Dixon repeated the misrepresentations which Spector made via mail. Dixon represented in these calls that Global Consulting Group, the company TL planned to merge with Reohr, was a strong staffing business. *Id.* ¶ 15. Dixon also led the Reohr partners to believe that TL's transaction with Global, prior to the merger, would be structured like TL's transaction with Reohr. In fact, the Global deal was intended to involve cash only. *Id.* ¶ 19.

In the spring of 1997, Spector and Dixon further represented to the Reohr partners that they were engaging in discussions with several other companies which prospectively could be merged with Reohr. *Id.* ¶ 21. These companies included Real-Time Consulting, Inc. in Dallas, and another company in San Francisco. *Id.* Thereafter, TL never informed the Reohr

partners that the RealTime deal was "dead," though TL did inform the Rice Sangalis investment firm of that fact when TL offered Rice the opportunity to invest in the Reohr deal. *Id.* ¶ 31.

In May or June 1997, Dixon phoned Robert English, one of the Reohr partners, from North Carolina. Dixon suggested the possibility that the Reohr partners would share one seat on the new board. Plaintiff joined the conversation and opposed the idea. Dixon then "promised" in that interstate call, that the Reohr partners would have three seats. *Id.* ¶ 27.

In September 1997, Dixon, by telephone, asked the Reohr partners to meet with the Rice firm in order to "pitch" Reohr. *Id.* ¶ 33. The Rice firm had never been mentioned by TL prior to September 11, 1997. According to the Amended Complaint, Rice was brought in to "dilute" TL's investment and risk in the merger. *Id.* TL succeeded in reducing its own investment in the Reohr deal to about $8 million. *Id.* ¶ 37. In September and October 1997, the Reohr purchase was nearing completion. Dixon, in a call from Georgia, again proposed that the Reohr partners should have only one board seat. *Id.* ¶ 34.

Following the merger, in February 1998, Dixon, in a call from North Carolina, told Plaintiff that his (Plaintiff's) employment in Broadreach's marketing department was not "working out." *Id.* ¶ 43. In that call, Dixon arranged a meeting with Plaintiff, at which he subsequently made it "apparent" that he wanted Plaintiff to resign, which Plaintiff then did. *Id.* In April or May 1998, Dixon phoned and visited Plaintiff, asking him not to come to future board meetings. *Id.* ¶ 44. From April 1998 through January 1999, Plaintiff was prohibited from attending board meetings, preventing him from monitoring financial events within Broadreach, including that fact that Broadreach had breached provi-

sions of its loan with PNC Bank and was renegotiating that agreement. *Id.* ¶ 46, 49. Plaintiff's board resignation was not voluntary, as evidenced in November 1998 board minutes. *Id.* ¶ 48. Plaintiff was never provided audited financial statements or records of board meetings. *Id.* ¶ 51. Though Dixon had promised to keep Plaintiff updated on Broadreach's finances, he never provided Plaintiff the board minutes for certain important meetings, nor with an April 1998 Option Holders Quarterly Report, which, allegedly, was aimed at deceiving investors—by reporting prominently Broadreach's growth in revenue but omitting mention of marginal 1998 income. *Id.* ¶ 54.

Defendants, in hopes of turning a quick profit, pursued "illegitimate objectives" in disguising the company as an electronic business consultancy, thus deceiving employees and investors into thinking that Defendants were pursuing legitimate business strategies. *Id.* ¶ 56. On August 10, 1999, TL, through Dixon, issued a press release, falsely claiming that Broadreach had expertise in the eBusiness area and that such expertise caused the company's business to double annually. *Id.* ¶ 57. On August 13, 1999, Dixon sent a letter to Broadreach options holders, stating that the company had had a very productive first half of 1999, but omitting mention of various financial problems. *Id.*

On November 18, 1999, Broadreach, due to poor economic performance, asked Plaintiff and other investors to provide a cash "infusion." *Id.* ¶ 62. In an interstate phone call, Dixon told Plaintiff that the company did not need money, but that the additional funds would make Broadreach more attractive to buyers. *Id.* Plaintiff declined to invest further.

On May 10, 2000, Broadreach CFO Robert Graham, acting for Dixon, sent a letter to Citizens Bank asking that the bank

waive a loan default committed by Broadreach. *Id.* ¶ 51, 66. Graham stated that the company's "eBusiness" business had grown to a projected $40 million and that the first quarter of 2000 had been "fantastic." *Id.* ¶ 66. On August 2, 2000, Citizens Bank issued a notice of default. *Id.* ¶ 69.

On August 9, 2000, in response to Plaintiff's inquiries as to the company's finances, Graham mailed to Plaintiff unaudited 1999 financial statements, making no mention of Broadreach's financial "peril." *Id.* As of September 2000, Broadreach was indebted to Citizens Bank for over $11 million.

### III. *Summary of the RICO Case Statement*

The 28–page RICO case statement contains numerous facts supporting the allegations of the Amended Complaint, particularly detailing various telephone calls and mailings by the Defendants which were supportive, and in furtherance of, the alleged scheme of Defendants to take over the company in which Plaintiff had a substantial equity position, and operate it for Defendants' own financial gain. The RICO case statement alleges predicate acts, consisting of telephone calls and mailings starting in February 1996 through August 2001. The facts alleged in these paragraphs are very detailed, with a consistent thread throughout them that Defendants were depriving Plaintiff of appropriate financial information and concealing from Plaintiff the actual business activities of the alleged enterprise, Broadreach, a corporation that took over the affairs of the original corporation, Reohr, and that Defendants controlled Broadreach with the purpose and intent of defrauding Plaintiff.

### IV. *Analysis*

■ The Plaintiff has presented sufficient factual details in the Amended Complaint and the RICO case statement to show that the alleged scheme continued for approximately five years, that Defendants themselves profited from the scheme, and that Plaintiff was left with a virtually worthless investment. Plaintiff has satisfied his burden of alleging closed or open-ended continuity, to allow an inference of a threat of ongoing criminal activity. The Court rejects Defendants' oft-repeated contentions that Plaintiff has failed to sufficiently allege predicate acts, relatedness, or a sufficient pattern of racketeering activity. The RICO case statement provides both detailed factual allegations as well as a narrative describing the pattern of activity and the relatedness of the many predicate acts to each other in carrying out the scheme.

■ The Court also rejects Defendants' arguments that the Complaint is not sufficiently specific under Rule 9(b). Plaintiff has provided dates, names, places and details of each transaction.

The real problem with Defendants' arguments is that they are just that—arguments where the Defendants ask the Court to draw inferences favorable to themselves from the allegations of the Complaint. Needless to say, the law is exactly the opposite. The Court is required to draw inferences favorable to the Plaintiff, particularly when the Plaintiff has carefully amended his Complaint and provided the detailed RICO case statement required by the Court's opinion of October 3, 2002. Whether Plaintiff's allegations will withstand summary judgment, and if so, whether they will be persuasive before a jury at trial, are considerations that are totally irrelevant at this point in the case. The Court simply cannot accept Defendants' contentions without completely ignoring the Plaintiff's theory of liability in the context of principles of law which re-

quire that Plaintiff get the favorable inferences.

### A. Case Law in this District Has Satisfied this Court that Plaintiff Has Adequately Plead the RICO Claims

There are a number of cases decided by this Court which have found RICO claims sufficient, and support the Court's conclusion. In *McHale v. Nu Energy Group,* 2002 WL 321797, 2002 U.S.Dist. LEXIS 3307 (E.D.Pa.2002), Chief Judge Giles held "the fact that plaintiffs have not plead which individual defendants mailed, faxed, or e-mailed particular checks, reconciliations, faxes and e-mails at issue in this case is not fatal to the mail fraud, wire fraud, and subsequent RICO claim ... Plaintiffs can establish scienter by pleading facts showing conscious or reckless behavior to defraud ... As discussed above, each of the defendants was instrumental in the everyday running of the company and made assurances [to plaintiffs] ... therefore, at this point in the proceedings, each defendant can have attributed to him knowledge of the fraud alleged by plaintiffs for purposes of the predicate acts of mail and wire fraud."

In *Westlake Plastic Co. v. O'Donnell,* 182 F.R.D. 165 (E.D.Pa.1998), Judge Reed found the allegations of the Complaint in that case sufficient under RICO. Judge Reed held: "Westlake's Complaint sufficiently pleads related racketeering acts that amount to or pose a threat of continued criminal activity. First, Westlake alleges that O'Donnell, pursuant to a scheme to defraud Westlake of profits by self-dealing, committed mail and wire fraud between February 1994 and February 1996...." *Id.* at 169. After finding that the requisite predicate acts of racketeering were pleaded adequately, Judge Reed concluded that "Westlake has also properly alleged that the predicate acts form a pattern. Under the relatedness prong, Westlake has alleged that the predicate acts serve the purpose of furthering O'Donnell's purported scheme, i.e., they have the same or similar purpose, results, participants and victims...." *Id.* at 171. Judge Reed goes on to find continuity and sufficiently alleged injury to business or property under the RICO allegations.

Judge Bartle of this Court, on facts showing much less activity and duration, found a RICO Complaint sufficient in *Katz v. Food Sciences Corp.,* 1999 WL 387154 (E.D.Pa.1999). These few citations provide abundant support for this Court's Order.

### B. Whether Plaintiff States a Claim under the Securities Laws

■ This Court's prior opinion rejected Defendants' argument that Plaintiff's claims arose under the securities law and were thus barred as a RICO predicate act by virtue of § 107 of the Private Securities Litigation Reform Act. Defendants repeat that argument as to the claims under 18 U.S.C. § 1962(b) in their renewed Motion to Dismiss, and the Court again rejects it.

Simply stated, Plaintiff's claim is not based upon the purchase or sale of a security, at least as alleged in the Amended Complaint. Defendants have not accepted the Court's suggestion that they renew their assertion with a properly documented Motion for Summary Judgment. Defendants cannot force Plaintiff to plead the case the way Defendants think the facts should be. It may be eventually found that Plaintiff's claims do arise out of the purchase or sale of a security, but that is not clear from the Amended Complaint. As noted above, the favorable inferences belong to the Plaintiff and not the Defendants.

## IV. *Conclusion*

Defendants have been properly noticed of the allegations, which the Court finds are legally sufficient. An appropriate Order follows.

### *ORDER*

AND NOW, this day of December, 2002, upon consideration of the Motion to Dismiss the Amended Complaint by Defendants TL Ventures, TL Ventures III L.P., TL Ventures III Offshore L.P., TL Ventures III LLC, TL Ventures III Interfund L.P., TL Ventures Management L.P., Arthur Spector and James Dixon, it is hereby ordered that said Motion is DENIED, and these Defendants shall answer the Amended Complaint within twenty (20) days.